UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EILEEN E. NUTT,

                              Plaintiff,

                                                      5:12-CV-0385
v.                                                    (GTS/TWD)

NEW YORK STATE,
STATE UNIVERSITY OF NEW YORK,
UPSTATE MEDICAL UNIVERSITY,

                              Defendants.
_____

APPEARANCES:                              OF COUNSEL:

EILEEN E. NUTT
Plaintiff *pro se*
124 Germania Avenue
Syracuse, NY 13219


THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**ORDER and REPORT-RECOMMENDATION**

       The Clerk has sent this *pro se* complaint together with an application to proceed *in forma*

*pauperis* to the Court for review.  (Dkt. Nos. 1 and 2.)  For the reasons discussed below, I order

that Plaintiff's *in forma pauperis* application is granted and recommend that her action be

dismissed with leave to amend.

I.       **ALLEGATIONS OF THE COMPLAINT**

       Plaintiff Eileen E. Nutt alleges that she began working as a Keyboard Specialist 1 for

Upstate Medical University Hospital on February 27, 2003.  (Dkt. No. 1 at 3 ¶ 1.)  On or about

August 15, 2008, Plaintiff was "approached and pressured" by her supervisor, Nicolene

Fratangelo, "to accept a transfer to the Department of Medicine." *Id.* ¶ 3.  Ms. Fratangelo said

that she was reorganizing the support staff structure and Plaintiff's transfer was an integral part

of her reorganization plans.  *Id.* at 3-4 ¶ 4.  Ms. Fratangelo told Plaintiff that she would receive a

promotion to Grade 7 with the transfer without any testing requirement.  *Id.* at 4 ¶ 6.

      Plaintiff began her new position as a Hospital Patient Access Services Clerk 1 on or about

August 15, 2008, at the Department of Medicine Stress/Echo Laboratory on the second floor of

the hospital.  *Id.*. ¶ 7.  Matthew Wallace was Plaintiff's immediate supervisor.  *Id.* ¶8.  Plaintiff

received satisfactory job reviews from both Mr. Wallace and Ms. Fratangelo.  *Id.* ¶ 10.

      From September through November 2008, Plaintiff's "requests to cease inappropriate

verbal behavior toward [her] by Mr. Wallace were ignored."  *Id.* ¶ 11.  The complaint does not

describe the nature of this "inappropriate verbal behavior."  In November 2008, Plaintiff

requested a meeting with Mr. Wallace and Ms. Fratangelo to discuss the "inappropriate

behavior."  *Id.* ¶ 12.  After the meeting, Ms. Fratangelo told Plaintiff "that she was interested and

concerned" and that Plaintiff should let her know if she had any further issues with Mr. Wallace.

*Id.* ¶ 13.

      "On at least three occasions within six months after the meeting, Ms. Fratangelo went out

of her way to tell [Plaintiff] she had no prior knowledge at [Plaintiff's] transfer of inappropriate

behavior by Mr. Wallace towards women.  However, since the meeting, she confirmed receiving

such knowledge.  Ms. Fratangelo therein apologized and encouraged [Plaintiff] to keep her

informed of any further issues."  *Id.* at 4-5 ¶ 14.

      On January 28, 2009, Plaintiff was reporting to her workstation at the hospital when she

slipped on a wet floor, became airborne, landed on her hands and knees, and rolled over in a

sitting position.  *Id*. at 2 ¶ 4.  A coworker provided Plaintiff with a chair and ice pack.  *Id*. at 5 ¶ 17.  Plaintiff sat in the chair until she was able to continue to her workstation after about thirty minutes.  *Id*.  No EMTs or medical attention "was called or provided to [Plaintiff] during the time of the incident."  *Id*. ¶ 18.

Upon returning to her workstation, Plaintiff immediately called and reported the incident to the New York State workplace incident hotline.  *Id*. ¶ 19.  Plaintiff completed the New York State employee report form and faxed it to the appropriate office.  *Id*. ¶ 20.  Plaintiff discussed the incident with Mr. Wallace.  *Id*. ¶ 21.  Plaintiff "determined [she] did not need medical attention or to see [her] personal physician on that day; however, [she] did keep [her] leg elevated at [her] workstation for the remainder of the day with an ice pack on [her] knee."  *Id*. ¶ 22.

For the next four to six weeks, Plaintiff developed swelling and pain in her left knee with progressive pain developing in both of her shoulders.  *Id*. at 6 ¶ 23.  After six weeks, Plaintiff's orthopedic surgeon drained fluid from her left knee and ordered an MRI of Plaintiff's rotator cuffs.  *Id*. ¶ 24.  The doctor diagnosed Plaintiff with a degenerative knee condition and torn rotator cuffs in both shoulders as a result of the fall.  *Id*. ¶ 25.

On or about April 2, 2009, Plaintiff requested an ergonomic evaluation of her workstation.  *Id*. ¶ 26.  Ms. Fratangelo supported the evaluation and encouraged an immediate appointment.  *Id*. ¶ 27.  The evaluation took place in April 2009.  *Id*. ¶ 28.  The evaluator concluded that Plaintiff's "tasks were not to include day-long data entry positions without frequent breaks and not to be restricted to repetitive work."  *Id*. at 7 ¶ 31.  The evaluator recommended that Plaintiff be provided with an orthopedic chair, a tray to support Plaintiff's

keyboard, and a headset.  *Id.* at 6 ¶¶ 29-30.  The chair did not arrive until January 2010.  *Id.* ¶ 29.

Plaintiff advised Mr. Wallace and Ms. Fratangelo that she was scheduled for surgery on her right shoulder on November 9, 2009.  *Id.* ¶ 26.  Plaintiff had the surgery as scheduled and remained home on Workers' Compensation from November 9, 2009 to January 25, 2010.  *Id.* at 7 ¶¶ 32, 34.  While Plaintiff was recovering, both Mr. Wallace and Ms. Fratangelo repeatedly contacted her asking when she was going to be cleared to return to work.  *Id.* ¶ 32.  Ms. Fratangelo urged Plaintiff to return to work as soon as her doctor would allow due to lack of coverage at Plaintiff's position.  *Id.* ¶ 33.  Ms. Fratangelo said that she would accommodate time Plaintiff needed for physical therapy and any ergonomic needs.  *Id.*

When Plaintiff returned to work, the accommodations she needed were three two-hour physical therapy sessions per week until April 9, 2010, no lifting more than ten pounds, and no lifting above her head.  *Id.* ¶ 35.  Plaintiff's coworkers covered for her during her physical therapy sessions.  *Id.* ¶ 36.

Plaintiff's August 20, 2010 Job Performance Review stated that Plaintiff "is great with dealing w/patients and staff on phone or in person.  She tries to stay upbeat and helpful.  Gets paperwork done but struggles with speed."  *Id.* at 8 ¶ 41.  Plaintiff provided a written rebuttal, stating that she was recovering from right shoulder surgery and was awaiting left shoulder rotator cuff surgery and was incurring increased pain.  *Id.* ¶ 42.

Plaintiff underwent surgery on her left rotator cuff on September 29, 2010.  *Id.* ¶ 43.  Ms. Fratangelo secured a new hire from another department on the same day as Plaintiff's surgery.  *Id.*  Ms. Fratangelo told Plaintiff that the new hire would cover her position until she returned.  *Id.* ¶ 44.  By February 24, 2011 this new hire had replaced Plaintiff.  *Id.*  The new hire was

4

fourteen years younger than Plaintiff and not close to retirement. *Id.* ¶ 45. The new hire was a woman. *Id.*

On February 11, 2011, Plaintiff's doctor authorized Plaintiff to return to work on February 24, 2011. *Id.* at 9 ¶ 47. Plaintiff faxed the form immediately to the hospital's Human Resources Department. *Id.* Plaintiff informed Ms. Fratangelo of her return date through an exchange of emails on February 13, 2011. *Id.* ¶ 48. Ms. Fratangelo informed Plaintiff via email that her job tasks would change, that she would sit at a different desk, and that her "co-worker, who would have maintained short-term coverage, was now replacing" her. *Id.* ¶ 49. Ms. Fratangelo did not inform Plaintiff that she would not be allowed to return to work with medical restrictions. *Id.* ¶ 52.

On February 23, 2011, a Workers' Compensation Specialist in Human Resources called Plaintiff and informed her that Ms. Fratangelo "did not accept [Plaintiff's] doctor's medical restrictions and therefore [Plaintiff] could not return to work." *Id.* ¶ 53. Plaintiff asked what the problems were and noted that the medical restrictions were identical to those put in place when she returned to work after her previous surgery. *Id.* ¶ 54. The specialist "could not and would not offer . . . any explanation," but simply repeated her statement. *Id.*

Plaintiff did not hear anything more from her employer until March 9, 2011 when Ms. Fratangelo called her at home and asked if she was ready to return to work. *Id.* ¶ 55. Plaintiff told Ms. Fratangelo that she had been ready to return to work since February 24, 2011. *Id.* at 10 ¶ 56. Ms. Fratangelo told Plaintiff that they were "all set" in the Stress/Echo Laboratory. *Id.* ¶ 57. Instead, Plaintiff would be transferred with the same job title to the Department of Physical Medicine and Rehabilitation. *Id.* ¶ 58. Ms. Fratangelo "stated it was quite hectic, but that

[Plaintiff] could learn it in time, and that [Plaintiff] would not lose [her] grade or pay; that [Plaintiff] should report to the new position the next day . . . at which time she would meet [Plaintiff] at 9:30 a.m." *Id.* ¶ 59.

Plaintiff reported to the Department of Physical Medicine and Rehabilitation the next day at 9:30 a.m. *Id.* ¶ 60. Plaintiff's new coworkers "appeared uncertain" about what Plaintiff would be doing and two told Plaintiff that they had only been informed two days earlier that Plaintiff would be arriving. *Id.* ¶ 61. Plaintiff's workstation was "quite dirty," the phone was not connected, and none of the ergonomic accommodations that Plaintiff had required since 2009 was in place. *Id.* ¶¶ 62-63.

When Ms. Fratangelo arrived, she indicated that the department was hectic but said that she was confident that Plaintiff could adjust with training and time. *Id.* at 10-11 ¶ 65. Ms. Fratangelo introduced Plaintiff to her coworkers and gave instructions about who would provide Plaintiff with training. *Id.* at 11 ¶ 66. No password was available for Plaintiff to access the computer system, so Ms. Fratangelo told Plaintiff to use a coworker's password. *Id.* ¶ 67.

Plaintiff's telephone was not hooked up until her second day and she did not receive a headset until her third day. *Id.* ¶ 68. Plaintiff was not given any formal training. *Id.* ¶ 70. She was, however, "given a large stack of data entry to do repetitively throughout the day," which was contrary to her 2009 ergonomic evaluation. *Id.* ¶¶ 70-71.

Plaintiff alleges that by "third day, [she] experienced pain to [her] left shoulder, hostility, rude behavior, [and] pressure . . . to complete the daily data entry." *Id.* at 11-12 ¶ 73.

On March 15, 2011, Plaintiff's coworker, Heather Azzoto, told Plaintiff that she was the middle person between Ms. Fratangelo and the support staff and asked Plaintiff if she needed to

discuss any issues regarding office functions.  *Id*. at 12 ¶¶ 75-76.  Plaintiff "expressed dissatisfaction with the way in which [she] found her workstation, inappropriate rude and pressured behavior, with no training for [her] new position."  *Id.* ¶ 77.  She told Ms. Azzoto that she had emailed Ms. Fratangelo to request a meeting about these issues.  *Id*.  Ms. Azzoto asked if she could be present at the meeting.  *Id.* ¶ 78.  When Plaintiff agreed, Ms. Azzoto called Ms. Fratangelo and set up a meeting for noon that day.  *Id*.  Ms. Fratangelo arrived at Plaintiff's desk at 1:00 p.m. and said that "it was an unusually hectic week and that it was only temporary and for everyone to be patient."  *Id.* ¶ 79.  Ms. Fratangelo never had the requested meeting with Plaintiff regarding the "ergonomic issues, concerns related to the hostile environment or policy and procedures."  *Id.* ¶ 80.

Throughout the five days that Plaintiff was back at work, she developed increasing pain in her left shoulder as she attempted to complete the data entry assignment at her workstation. *Id.* ¶ 81.  By the end of the day on Wednesday, she contacted her doctor about her shoulder.  *Id.* at 12-13 ¶ 82.  She called in sick the next day, Thursday, March 16, 2011, and went to the doctor. *Id.* at 13 ¶ 83.  Her doctor ordered her to stay out of work for another day to reduce the inflammation in her shoulder.  *Id*.  On Friday, March 17, 2011, Plaintiff's doctor faxed a return-to-work release indicating that Plaintiff should do no lifting of more than ten pounds, no lifting over her head, sedentary work only, and no repetitive tasks.  *Id.* ¶ 84.

On Monday, March 18, 2011, Plaintiff received a phone call from Human Resources stating that her "supervisor would not accept [her] medical limitations until such time as [her] doctor indicated all restrictions were lifted."  *Id.* ¶ 85.

Plaintiff continued to see her doctor for follow-up and "the medical restrictions remained

7

in place, but [she] was released to return to work." *Id.* 13 ¶ 86.  "All doctor-ordered return-to-work releases since March 18, 2011, were fax[e]d to Human Resources, without any further response." *Id.* ¶ 87.

On or about May 20, 2011, Plaintiff received a letter from the Hospital informing her that she would be terminated as of July 18, 2011 unless her doctor would release her to work without any medical restrictions. *Id.* ¶¶ 88-89.  On or about July 19, 2011 Plaintiff received a letter stating that she had been terminated. *Id.* ¶ 90.

On June 20, 2011, Plaintiff filed a complaint with the New York State Division of Human Rights charging discrimination on the basis of age, disability, and sex. *Id.* at 13-14 ¶ 92. The United States Equal Employment Opportunity Commission issued a dismissal and notice of rights dated November 30, 2011. *Id.* at 14 ¶ 94.

Plaintiff filed her complaint in this Court on March 1, 2012.  (Dkt. No. 1.)  The complaint names New York State, the State University of New York, and SUNY Upstate Medical University as defendants. *Id.* at 1-2.  Plaintiff requests reinstatement to her former position at the same pay rate including any upgrade, any and all benefits as if her termination had never occurred, reasonable accommodations according to the April 2009 ergonomic evaluation, and reasonable accommodations under the Americans with Disabilities Act. *Id.* at 14.

## II.   PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff may properly proceed with this matter *in forma pauperis*.

III.    **LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT**

28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, " the court shall dismiss the case at any time if the court determines that  . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[1]  Thus, the court has a responsibility to determine that a complaint may be properly maintained before it may permit a plaintiff to proceed with an action *in forma pauperis*.[2]  *See id.*  Although the court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983), there is a responsibility on the court to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action *in forma pauperis*.  *See e.g. Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

---

[1] In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

[2] Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(e) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974), as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327.

9

IV.     **ANALYSIS**

A.      **Eleventh Amendment Immunity**

Plaintiff has sued New York State and two state entities[3] for, *inter alia*, violating the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA") .  Under the Eleventh Amendment, a state and its agencies are generally immune from suit in federal court.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996).  Eleventh Amendment immunity protects a state and its agencies unless (1) there has been a clear abrogation of the immunity by Congress; or (2) the state has explicitly and unequivocally waived immunity.  *Trivedi v. New York Unified Court Sys. Office of Court Admin.*, 818 F. Supp. 2d 712, 722 (S.D.N.Y. 2011).  Where Congress has not abrogated the immunity and the State has not waived immunity, "a plaintiff may sue a state official acting in his official capacity . . . for prospective, injunctive relief from violations of federal law."  *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) (punctuation omitted).

Here, Congress has not abrogated and New York has not waived immunity from claims brought under the ADA or the ADEA.  *Trivedi*, 818 F. Supp. 2d at 722.  Plaintiff's only recourse under the ADA and the ADEA, then, is to sue a state official in his or her official capacity. Plaintiff has not done so.  Therefore, I recommend that the Court dismiss Plaintiff's ADA and ADEA claims with leave to amend.[4]

---

[3]      SUNY "is an integral part of the government of the State of New York and when it is sued the State is the real party." *Dube v. State University of New York*, 900 F.2d 587, 594 (2d Cir. 1990) (punctuation omitted).

[4]      In addition to the immunity issue, the complaint fails to state a claim under the ADEA because Plaintiff does not allege how old she is now or how old she was during the relevant time period.  A cause of action under the ADEA is statutorily available only to

**B.    Gender Discrimination**

Plaintiff claims that Defendants discriminated against her on the basis of her sex.  (Dkt.

No. 1 at 13-14 ¶ 92.)  This claim is not barred by the Eleventh Amendment because Congress

abrogated states' immunity for Title VII claims of sex discrimination.  *Fitzpatrick v. Bitzer*, 427

U.S. 445 (1976).  Therefore, I will analyze this claim on its merits.  Plaintiff does not state

whether she is suing under a discrimination theory, a harassment theory, or both.  I will analyze

both claims.

1.    Discrimination

Title VII protects individuals who are discriminated against on the basis of "race, color,

religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To state a sex discrimination claim

under Title VII, a plaintiff must allege facts plausibly suggesting that (1) she was within the

protected class; (2) she was qualified for the position; (3) she was subject to an adverse

employment action; and (4) the adverse action occurred under circumstances giving rise to an

inference of discrimination.  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009).

Here, Plaintiff has adequately pleaded the first three elements for the purposes of this

initial review.  However, Plaintiff has not pleaded facts plausibly suggesting that the adverse

actions occurred under circumstances giving rise to an inference of discrimination.  "[A]n

inference of discriminatory intent may be derived from a variety of circumstances, including, but

not limited to: the employer's continuing, after discharging the plaintiff, to seek applicants from

persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the

---

individuals who were at least forty years of age at the time of the alleged discriminatory action.
29 U.S.C. § 631(a).

plaintiff's performance in ethnically degrading terms; or its invidious comments about others in

the employee's protected group; or the more favorable treatment of employees not in the

protected group; or the sequence of events leading to the plaintiff's discharge." *Id.* at 502

(punctuation and citation omitted).  The complaint does not include any such facts, or any other

facts from which an inference of discriminatory intent could be derived.  Therefore, I recommend

that the Court dismiss Plaintiff's sex discrimination claim with leave to amend.

    2.   <u>Hostile Work Environment</u>

Given the complaint's allegations about Mr. Wallace's "inappropriate verbal behavior"

and the "hostile environment" when she returned to work in March 2011, Plaintiff may be

attempting to plead a hostile work environment cause of action.

"To state a claim for a hostile work environment in violation of Title VII, a plaintiff must

plead facts that would tend to show that the complained of conduct: (1) is objectively severe or

pervasive - that is, creates an environment that a reasonable person would find hostile or abusive;

(2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3)

creates such an environment because of the plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113

(2d Cir. 2007) (punctuation omitted).  Here, Plaintiff has not alleged facts plausibly suggesting

either the first or the third element.  Therefore, I recommend that the Court dismiss Plaintiff's

hostile work environment claim with leave to amend.

    **WHEREFORE**, it is hereby

    **ORDERED** that the application to proceed *in forma pauperis* (Dkt. No. 2) is

**GRANTED**; and it is further

    **RECOMMENDED** that the complaint (Dkt. No. 1) be dismissed with leave to amend;

and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: May 15, 2012
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

13